### Ex parte CAPLIS (two cases).

(District Court, W. D. Texas, San Antonio Division. April 4, 1921.)

Nos. 3286, 3287.

1. **Army and navy** ☞5—**Civil status can be changed only by law.**

Status of civilian can be changed to that of soldier only by virtue of some law of the United States.

2. **Army and navy** ☞20—**Notice required for induction into service under first Selective Service Regulations; "notify."**

The word "notify," in section 133 of the first Selective Service Regulations, requires the adjutant general to give notice to or make known to the party called into service the day and hour on which he is to appear; the word both in legal significance and by Webster's definition meaning to "give notice" to, or "make known," and the mailing of such notice creates presumption of delivery, which is conclusive, unless contrary is shown.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Notify.]

3. **Notice** ☞5—**"Constructive notice" defined.**

Notice is of two kinds, actual and constructive; "constructive notice," being a creature of the statute, is ineffectual unless provided for by statute, and having the same effect as actual notice. It means notice imputed to one not having actual notice; an inference of notice not rebuttable, a conclusive presumption that cannot be controverted (citing Words and Phrases, First and Second Series, Constructive Notice).

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Army and navy ⊙=⇒20—Civilian held not inducted into military service by mailing of notice prior to amended regulations.**

Where a registrant's status is to be changed from that of civilian to soldier by mailing him the order of induction into the military service, under the provisions of section 133 of the first Selective Service Regulations, he is entitled to actual notice when the presumption raised by mailing is rebutted, and therefore, if the order is not in fact received, through mailing, and the presumption of notice be rebutted, induction into the military service has not been effected; but the amended Selective Service Regulations of September 16, 1918, providing that the mailing of the order of induction constituted constructive notice of its terms, the effect of which is to change the status of a delinquent registrant civilian to that of a soldier, and under it a civilian may be inducted into military service by either actual or constructive notice.

Habeas Corpus. Petitions by Thomas Caplis, Jr., and by Joseph Caplis against Col. John W. Heard, United States Army. Hearing on order to show cause why the writs should not issue. Ordered that respondent deliver petitioners to the United States marshal to await further orders of the court.

Terrell, Davis, Huff & McMillan, of San Antonio, Tex., for petitioners.

Hugh R. Robertson, U. S. Atty., and Leo Brewer, Asst. U. S. Atty., both of San Antonio, Tex., for respondent.

WEST, District Judge. The cases will be considered together, as they are controlled by the same facts and the same questions of law. The petitioners were charged, by indictment filed in December, 1918, in the United States District Court at Shreveport, La., with conspiring to evade the provisions of the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2019a, 2019b, 2044a-2044k) on or about June 9, 1917. The respondent's return shows that the petitioners were held by the military authorities at Ft. Sam Houston under a charge of conspiracy to desert from the army. A question of jurisdiction is presented—whether the petitioners are civilian citizens of the United States or whether they are soldiers of the army of the United States. The following are the facts:

[1] Petitioners registered under the terms of the Selective Service Act on June 5, 1917. Within five days after having registered they left the United States, and remained absent until long after the Armistice. Their whereabouts were unknown; their mother testifying that she did not know where they were. On December 29, 1917, and likewise on January 4, 1918, questionnaires, as provided by the rules and regulations of the Selective Service Act, were mailed by their local board at Benton, La., to them at their home address, Taylortown, some 30 miles distant. These questionnaires were never returned to the local board. There is evidence to the effect that they were destroyed by members of the Caplis family. The local board placed each of the petitioners in class 1, posted and mailed notices of such classification, and made the required report of delinquency to the Adjutant General of the state of Louisiana, who thereafter duly issued an order, described in section

⊙=⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

133 of the Selective Service Regulations as the "order into military service." This order appeared on a post card, "form 1014," directing that, unless certain conditions were performed, which were not in fact performed, "you shall be in the military service of the United States on and after April 2, 1918, at 10 o'clock p. m." The record from the Adjutant General's office shows that this form 1014, embodying the order referred to, was mailed to each of the petitioners on March 19, 1918, and addressed to Taylortown, La., being the address given by petitioners when they registered. At the time of issuance and mailing of this order, both petitioners had long since fled the country. Neither has been discharged from the military service, if either can be said to be or to have been in the military service. If they are soldiers, their status as civilians must have been changed by some law of the United States.

Directing attention to the provisions of the Selective Service Act, and the regulations promulgated by the President thereunder, under which these parties must necessarily have been inducted into the military service, if at all, it appears that on June 5, 1917, petitioners reported at the designated point in Louisiana—Benton—and duly registered. No claim is made that mere registration inducted them into the military service. The next forward step toward entry into the military service was the mailing of the questionnaires by the local board of Benton to each petitioner in December, 1917, and January, 1918. At that time the petitioners had fled the country, and the questionnaires were never received by them. Because of their failure to return these questionnaires they were classed by the local board as delinquents. The word "delinquent," in the Selective Service Regulations, is applied to the registrant who is derelict in his duties so far as registering and reporting for duty is concerned, and the word "desertion" is applied to the runaway registrant after having been inducted into the military service. In that sense the inquiry is whether these parties were delinquents, or whether they are soldiers, or deserters after having been inducted into the military service. No claim is made that the failure to return the questionnaires constituted an induction of these registrants into the military service, or constituted them soldiers; but the respondent does claim these registrants were inducted into the military service because of the post card order "form 1014" mailed by the Adjutant General of the state of Louisiana to each of the petitioners on March 19, 1918, and contends that, though the parties did not actually receive the post card, order form 1014 notice, nevertheless by reason of the force and effect of the Selective Service Act and the regulations promulgated thereunder, they became and were involuntarily inducted into the military service, and became soldiers.

The Adjutant General of the state of Louisiana was acting under section 133, First S. S. R., when he issued his order of induction. The President, under date November 8, 1917, by proclamation, first promulgated the rules and regulations to carry into effect the provisions of the Selective Service Act. These were amended by the subsequent proclamation of September 16, 1918. A copy of section 133 is inserted next hereunder, showing the text of the section as it existed from No-

vember 8, 1917, until its amendment September 16, 1918; the amendment being shown by the underlined portions, the balance being the original text of the first proclamation:

"Section 133. Adjutant General to order delinquents to report; and notice to registrant.—Upon receipt of form 1013 (p. 233), the Adjutant General of the state shall forthwith notify on form 1014 (sec. 286, p. 234) the persons named therein to report to him for instructions by mail, telegraph, or in person not later than a day and hour to be specified by such Adjutant General in such notice, which day and hour shall not be less than 10 days from the date of the notice. *A copy of form 1014 (p. 234), showing the names of registrants*

Amendment Sept. 16, 1918: *under words "Delinquent order number," shall also be sent at the same time to the registrant's local board for its information; and the fact and date of mailing form 1014 shall be entered in column 5 of form 1013A (sec. 318, p. 270).*

"The day and hour shall be specified by the Adjutant General of the state as the day and hour from and after which such registrants shall be in the military service of the United States, unless, upon the registrant reporting as ordered, the Adjutant General shall stay or rescind such order into military service.

Actual Notice "If the order into military service is not stayed or rescinded by the Adjutant General by a subsequent order in writing prior to the arrival of the day and hour so specified, then from and after the day and hour so specified such person shall be in the military service of the United States, and after the arrival of such day and hour the Adjutant General of the state has no power to stay or rescind such order; *and either the entering of such date after the name of any such regis-*

Amendment Sept. 16, 1918: Constructive Notice *trant on form 1013A, or the mailing to any such registrant of form 1014, shall constitute the giving of notice to such registrant that from and after the day and hour named in form 1014 he will be in the military service of the United States."*

It is apparent that the provisions of this section must be strictly complied with by the Adjutant General if the changed status and new duties imposed upon the citizen are to be fixed by a conclusive presumption of notice, rather than by actual notice. The only duty and obligation placed on the citizen by the act and the President's proclamation was to present himself on June 5, 1917, to the local board of his precinct for the purpose of enrollment. The proclamation further advised the country that, merely because some of its citizens had been called on to register, the ordinary avocations and pursuits were to be continued, and the usual course of life and business in the country was not, by reason of the registration, to be interfered with. Young men affected were especially warned not to surrender their occupations. Millions registered who were never called. The registrant was advised he was liable to be called, and if he willfully committed any act which interfered with any obligation, he might become subject to sections 37, 125, and 337 of the Criminal Code of the United States, but in no case did the act, proclamation, or regulation automatically change his status as a citizen.

In Ex parte Henry, 253 Fed. 209, Geiger, District Judge, Eastern District of Wisconsin, concerning the status of the registrant citizen, says:

"That the law [Selective Service Law] contemplates continued existence of civil authority in all of the states until such time when it shall unmistakably be indicated that ordinary civil authority is superseded. And it is not incumbent upon the courts to ascribe to Congress an intention by this law to supersede a status which attached to an individual prior to the time of its attempted application to that individual. * * * I am unwilling to give the law that effect, because it ascribes to Congress an intention which it would have effectuated other than through legislation disclosing merely the ranges of ages and the additional direction that those within those ages should be *liable* to be drawn. Congress intended to recognize the continued existence of the civil authority of the states and the nation, and, necessarily, to recognize the continued status which individuals might have acquired by virtue of the exertion of such continued civil authority, and when it appears, as it appears here, that the individual called was lawfully in the custody of the state, in the exercise of its civil authority to prevent or to vindicate infractions of its criminal law, it should not be said that Congress intended that that status should be superseded."

The Selective Service Act was passed by Congress with full cognizance and appreciation of the Fifth and Sixth Amendments of the Constitution, and without any attempt to abridge the rights, privileges, and guaranties of those two amendments. It is elementary that, before any change of status of the citizen affecting his relations with society, the state or nation, certain definite procedure must be put in motion to accomplish such results. For instance, the marriage relation, the change from that of the single man to that of being married; the dissolution of the marriage relation; aliens seeking admission to the United States; seeking to become a citizen; status of an alien and his deportation. It is useless to multiply instances. In all these cases affirmative action of some kind is provided by law, or regulations, with notice to the person to be affected. The Congress and the President, in passing the act and proclamations, the rules and regulations for the enforcement of the act, had in mind the provisions of the Constitution as to due process of law. It has been declared constitutional. Selective Draft Law Cases, 245 U. S. 366, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856.

The terms of the act itself did not bring about this change of status. Registrants were not even required to remain in their permanent place of residence, and it was not until November 29, 1917, that registrants were required to notify the local board of their change of post office address, which, it will be noted, was long after these petitioners had fled the country. With reference to the question of residence, Circuit Judge Morrow, in United States v. Wheeler (D. C.) 254 Fed. 615, says:

"The act did not require registrants under the act to remain in their permanent homes and actual places of legal residence until drafted into the military service of the United States, nor did the selective service regulations prescribed by the President of the United States make such a requirement; but, on the contrary, the location of the registrant elsewhere than at his permanent home and actual place of legal residence at the time of his call into the military service was provided for in such regulations, and the absence from home of the registrant in no way prejudiced his rights under the act or under the regulations of the President."

What character of notice is provided by the regulations to be given to a registrant to be inducted into the military service? It will be observed that the provisions as to notice in section 133, appearing in the

first proclamation, are published in the rules and regulations dated November 8, 1917, providing by its last paragraph that "from and after the day and hour specified" in the order form 1014, by which the Adjutant General was "to notify the registrant by mail, telegraph, or in person, that such person shall be in the military service of the United States," and that the amendment or revision of these rules and regulations, of date September 16, 1918, amended the last paragraph and provided, among other things, that the mere fact of mailing to the registrant the order form 1014 should constitute notice, and that "from and after the date * * * he would be in the military service of the United States." In other words, at the time, March 19, 1918, the Adjutant General gave the notice as required in the regulations, the fact of mailing, etc., was not affirmatively declared to be notice, whether the registrant received it or not, as it subsequently was in the amended Selective Service Regulations of September, 1918.

Section 7 of the first proclamation, S. S. R., provides for constructive notice to registrants. This section refers purely to the mailing of the questionnaire as provided by section 92, and in paragraph D of that section it is provided that mailing of such notice, etc., shall constitute the giving of notice to the registrant, and all concerned, and charges the registrant with notice of the day upon which the duty is to be performed, etc., regardless of whether or not that mailed notice is actually received.

After the mailing of the questionnaire and its return by the registrant to the local board, he was classified, and, if placed in class 1, was subject to induction into the military service. Induction by the local board was accomplished by the mailing of a notice, form 1028, to the last known address of registrant under the procedure as set forth in section 157, S. S. R. The section as to notice provides as follows:

"From and after the day and hour thus specified each registrant shall be in the military service of the United States, and the mailing to any such registrant of the order into military service shall constitute the giving of notice to him, and that from and after such day and hour he will be in the military service of the United States."

[2] These provisions as to notice required to be given to a registrant were contained in the first published Selective Service Regulations, and the fact that the same effect as to notice was not at that time given to the same character of notice in section 133 provokes the inquiry as to what effect the failure to do so would have. Under provisions of section 133, First S. S. R., would it be necessary for the Adjutant General to give actual notice to the party, or would the mailing to his address, of itself, be sufficient to induct the party into the military service, where it was affirmatively shown that the mailed notice had not been received? The word "notify," both in legal significance and by Webster's definition, means "to give notice" to, or "to make known." The word "notify" in section 133 requires the Adjutant General to give notice to or to make known to the party called into the service "of the day and hour * * *" upon which he is to appear. The mailing of such a notice creates the presumption of delivery, which is conclusive unless the contrary is shown. Wigmore on Evidence, § 95; Rosenthal v. Walker, 111 U. S. 185, 4 Sup. Ct. 382, 28 L. Ed. 395; Schutz

v. Jordan, 141 U. S. 219, 11 Sup. Ct. 906, 35 L. Ed. 705; Ex parte Blazekovic (D. C.) 248 Fed. 327.

The Adjutant General complied with the provision of the statute as to mailing, but the evidence conclusively shows that neither of the parties received such mailed notice; nor is there any evidence to show or contention made that they received notice from any other source or character. Section 133 as it stood as of the date the notices were mailed to these registrants made no provision for constructive service by conclusive presumption of receipt of the notice mailed, whether actually received or not. To change the status of the individual from citizen to soldier, and give an effect to the mailing of the notice not then provided by the law, would require the court to enter the field of legislation to do something that the law should have provided for, and did so provide at a subsequent date. The mailing would be ineffectual, unless he received the notice. Induction could not follow, unless the mere mailing of the notice as provided in the subsequent regulations had the effect of raising the conclusive presumption of receipt, whether actually received or not. That the involuntary induction provided in sections 7 and 157, S. S. R., both specifically provide for involuntary induction, whether the notice was received or not, and the fact that in the amended and revised proclamation provisions were inserted that did conform to these requirements, is persuasive that the President wished to correct an error of the former procedure, and close a gap which enabled the registrant to avoid military service, even though by such avoidance they rendered themselves liable to punishment under the civil law. Whether the Congress or the President had the power to provide for the involuntary induction by means of a notice, such as referred to, whether received or not, is not before the court in this case, because the regulation at the time in question contained no such provision.

[3] What is constructive notice? The few cases maintain without exception the declarations of the early English cases on the subject. These have been approved by the Supreme Court of the United States in Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 12 Sup. Ct. 239, 35 L. Ed. 1063, and Burck v. Taylor, 152 U. S. 653, 14 Sup. Ct. 696, 38 L. Ed. 578. They hold in effect that notice is of two kinds—actual and constructive; that constructive notice is a creature of the statute, and is ineffectual unless provided by statute; has the same effect as actual notice; means notice imputed to one not having actual notice; an inference of notice not rebuttable; a conclusive presumption that cannot be controverted. For cumulative authorities, see Ruling Case Law, vol. 20, p. 342, and Words and Phrases under the subject head of "Constructive Notice." Assuming that the Selective Service Regulations have the force and effect of a statute, it is to be noted that section 133, First S. S. R., did not provide that the notice by mail would be effective as constructive notice, though it did so by subsequent amendment. If the presumption of notice by mail is rebutted, as it is in the present case, then, applying the definition of constructive notice, there is no ground upon which the claim that the provisions of section 133, First S. S. R., without the amendment, could be given effect as constructive notice; that is to say, imputing notice to one not having actual notice.

The case of Farley v. Ratcliff, 267 Fed. 682, a decision rendered by the Circuit Court of Appeals for the Fourth Circuit July 6, 1920, is the only case which bears upon the question of involuntary induction by purely constructive service. That was a case under section 157, First S. S. R., by the local board, on form 1028. The facts in that case showed that the chairman of the local board testified he did not know whether the petitioner ever got the notice or not; the registrant's post office being some 20 miles away. Despite the fact that the regulations provided that the proof of mailing and entry of a certain date of mailing was all that was required to cause induction, the court, in commenting upon his testimony, says this of itself entitled the petitioner to discharge from answering the crime of desertion. The court further says:

"If, as a matter of fact, he never received notice, and knew nothing of its issuance, his liability of any offense is a matter of serious doubt, and least of all could it be said that the mailing of a notice he did not receive, and did not know of, inducted him into the military service, and, for his failure to respond, that he was a deserter therefrom."

The Farley Case, however, was based upon a consideration of the question of the extent of the jurisdiction of the court-martial, and as to whether or not the crime of desertion had been specifically set forth. This case, therefore, may not be considered as a direct authority upon the point named, but it is the only authority that goes so far.

Consideration has been given to the Bergdoll Cases. The first of these, styled "Matter of Grover C. Bergdoll v. Military Commander, Governor's Island" (Learned Hand, District Judge, March 5, 1920, no written opinion). The question of notice of induction does not appear to have been considered an issue by Judge Hand. He refers casually to the fact that notice was given as prescribed by section 133 of the S. S. R. The facts in that case did not show affirmatively whether the mailed notice was received or not, but from a consideration of the facts concerning the same defendants in other cases against them, two judges have stated that there was no question raised as to the notice not having been received. It is not clear that Judge Hand decided that under the first Selective Service Regulations, prior to amendment September, 1918, the mailed order alone was sufficient to bring about induction, whether received or not.

Another case, United States v. Erwin Bergdoll (opinion by District Judge John C. Pollock, Kansas City) 274 Fed. 458 (April, 1921), refers to the effect of mailing of notice under section 133, First S. S. R. In that case the court says:

"I am convinced the same must be presumed to have been by him received, in the absence * * * of any positive showing to the contrary."

Extraneous facts dehors the record, showing respondent's authority, were heard and considered by the court, and from these facts the court concludes:

"There can be no doubt whatever but that petitioner did receive actual personal notice of the orders inducting him into service."

Another case, United States v. Erwin Bergdoll and Grover C. Bergdoll, by Oliver B. Dickinson, District Judge, Eastern District of Pennsylvania, on motion for new trial, 272 Fed. 498: The facts show that notices were mailed to Grover Bergdoll from July 29, 1918, to August 8, 1918, and notices to Erwin Bergdoll from April 29, 1918, to May 9, 1918. Among other questions considered by the court was whether Erwin and Grover Bergdoll had been inducted into the military service, and whether notice should be given to them of the orders bringing about the change of their status from civilian to soldier. The court says:

"He [Erwin Bergdoll] was entitled to notice [of the day on which he must report for service]. This was his right. No question is raised, however, in the instant case, that the notice was not given and received. When notice was given him of his selection, he had 10 days during which he kept his status as a civilian. This, also, was his right. Until the expiration of the 10 days he could not have committed a military offense, because he was not in the military service. It is to be observed that his status was changed when and as changed by the * * * law, and not the ruling of the board."

These cases on the question of involuntary induction by constructive notice required are of doubtful aid, because of vital differences in the facts between those cases and the one at bar. In the Bergdoll Case (1) there was no evidence offered to show that the Bergdolls had *not* received the induction order forms mailed to them, and (2) the court finds that the Bergdolls *had actual notice* of the orders. In the present case the evidence was conclusive that the Caplis brothers (1) had not received the induction order mailed to them; nor (2) had they received actual notice thereof.

From the foregoing it results:

[4] Where a registrant's status is to be changed from that of civilian to soldier, by mailing him the order of induction into the military service under the provisions of section 133, First S. S. R. (November 8, 1917), he is entitled to actual notice when the presumption raised by mailing is rebutted. Therefore, if the order is not in fact received, through mailing, and the presumption of notice be rebutted, induction into the military service has not been effected. He is still a registrant civilian, not a soldier subject to military court-martial.

On the other hand, section 133, Second or Amended S. S. R. (Sept. 16, 1918), provides that the effect of the mailing of the order of induction is to raise against the registrant the conclusive presumption of notice of the induction order, whether received or not. This is constructive notice, the effect of which is to change the status of the delinquent registrant civilian to that of soldier. Consequently this section as amended provides for induction into the military service by either actual notice or constructive notice.

The court's order will be that the respondent deliver the petitioners to the United States marshal to await further orders of the court.